Commonwealth ex rel. Mulligan *v.* Smith.
Warden.

OPINION BY KELLER, P. J.:

We have given this petition for writ of habeas corpus earnest and careful attention.

The point involved is whether a convict, serving a sentence for burglary in a county jail, who, on petition of the warden, is committed as an insane criminal to a State Hospital for the Insane, after an examination by two physicians appointed by the court, under the Mental Health Act of July 11, 1923, P. L. 998, (sec. 308), and who escapes from said hospital, can be legally sentenced to the penitentiary on pleading guilty to crimes committed in another county while thus at large, if on his arraignment and sentence he shows no signs of insanity or a disordered mind, and raises no question as to his sanity, and since his incarceration in the penitentiary has exhibited no signs or symptoms of mental disorder. Our opinion, after due consideration, is that he can.

Relator has a long criminal record. Since 1903 he has spent some 33 years of his life in penal institutions; but for the purpose of this petition it is unnecessary to go further back than 1924.

On November 13, 1924 he pleaded guilty to a 'district attorney's bill' in the Court of Oyer and Terminer of Montgomery County to No. 95 November Sessions, 1924, charging burglary and larceny, and was sentenced the same day to imprisonment in the Montgomery County prison for not more than eight years nor less than four years, to be computed from that date.

On June 4, 1926 the warden of the county prison filed a petition asking for an inquiry into the prisoner's condition under the Mental Health Act of July 11, 1923, P. L. 998, and the court, pursuant to section 308 of said act, forthwith ordered an inquiry by two qualified physicians, who examined the prisoner on June 8 and 9, 1926 and reported to the court that he was insane and in such condition as to make it necessary that he be cared for in a hospital for mental diseases. On June

14, 1926, the report was approved by the court and the prisoner was found to be of a criminal tendency and he was ordered to be committed to the State Hospital for the Criminal Insane. He was, in fact, sent to the *State Hospital for the Insane at Norristown.* It does not appear why he was sent there instead of to the *State Hospital for the Criminal Insane at Farview.*

On October 12, 1926, after being confined in the *prison and hospital* for one year and eleven months he escaped from the hospital.

On November 22, 1926 he pleaded guilty to three indictments in the Court of Oyer and Terminer of Northampton County, Nos. 69, 71 and 76 September Term 1926, charging burglary, and was sentenced to the Eastern State Penitentiary for a term of not less than five years and not more than ten years on each bill, the sentences to run consecutively.

There is no record that at the time of his arraignment, pleas and sentences on said indictment he showed any signs of insanity or mental weakness, nor does it appear that he informed the court of his commitment to the State Hospital for the Insane at Norristown and his escape therefrom.

The Court of Montgomery County had been notified by the Superintendent of the Hospital on October 1, 1926 that the 'subject' [i. e. the prisoner] had been presented "to the entire medical staff for a thorough medical examination and the results of the examination show that Charles Mulligan, alias Stanley Thomas, no longer needs the remedial or custodial care of the Norristown State Hospital", and the Superintendent had requested a court order to transfer the subject back to the county jail to which the court replied that the proper procedure would be for the hospital to file a petition for a rule on the warden to show cause why the 'subject' should not be returned to the county jail. Before this could be done, the 'subject' escaped.

After Mulligan's escape and apprehension, but before

his arraignment and sentence, the Superintendent, on November 18, 1926 wrote to the President Judge of the Montgomery County Court telling of the 'subject's' arrest by the Bethlehem police, and expressing his belief that they would not surrender him to the hospital, and again asked for permission to discharge the 'subject'. The Judge replied on November 23, 1926 that he had taken the matter up with the District Attorney's office; that they would lodge a detainer with the Northampton County authorities, and, "I see no reason why you could not close your files in this matter in any way you deem proper." Accordingly an entry was made by the Superintendent of the Hospital on the record of the case that Mulligan was "discharged by order of the Court".

It appears from the very careful and explicit return of the warden of the penitentiary, that when Mulligan was received at the Eastern State Penitentiary on November 23, 1926, he was entered to serve a back parole period of approximately two years remaining on a sentence imposed by a Philadelphia County Court on September 13, 1916. On September 1, 1928 this back parole time was completed and he was technically discharged and the same day was re-entered to start serving the sentences imposed by the Northampton County Court on bills Nos. 69, 71 and 76, September Term 1926.

The Board of Pardons, in passing upon the prisoner's application for commutation of sentence, had full knowledge of all the foregoing, and had before it the report of the penitentiary psychiatrist, Dr. Roche, in which, as of date of June 4, 1940, and confirmed by him on April 9, 1942, he stated, "In the interval since admission to the Eastern State Penitentiary, 11-7-26, at no time has the inmate exhibited signs or symptoms of mental disorder. His history of hospitalization in Norristown State Hospital from June 16, 1926 to October 12, 1926 for alleged mental disorder may be disregarded in the present examination of the inmate."

With these matters before it, the board held that Mulligan had completed the minimum sentences imposed on bills No. 69 and No. 71, and it commuted the minimum sentence on bill No. 76 to a minimum of 3 years, 8 months and 20 days expiring May 21, 1942, and on July 20, 1942 granted him a release on parole, with his parole period expiring September 1, 1948, a period of 6 years, 1 month and 11 days.

On September 16, 1942 he was brought to trial in Philadelphia County on a bill of indictment to No. 604 August Term, 1942, charging aggravated assault and battery with intent to steal, and larceny, and was found guilty. Sentence was suspended and he was returned to the penitentiary for violation of his parole on No. 76 September Term, 1926, Northampton County, on which he is now confined.

There is no question raised as to the petitioner's present sanity. He asserts that he is sane and is entitled to his discharge. Even if his legal contention were upheld he could not be *discharged,* for he has four years and one month yet to serve on his sentence to the Montgomery County prison on November 13, 1924 (No. 95 November Sessions, 1924), and there is no question as to his sanity when he committed the offense for which he was then sentenced. He has never been discharged or relieved of the unserved portion of that sentence.

But, irrespective of that, we are of opinion that his contention is not supported by the authorities.

Ordinarily, sanity is presumed, and where mental capacity at the time of the commission of an act is in issue, the Commonwealth is aided by that presumption and is not required to prove affirmatively the accused's mental capacity to commit the act: *Com. v. Iacobino,* 319 Pa. 65, 68-9, 178 A. 823. The judgment of the court, finding one of unsound mind, is not conclusive that he remains so: *Com. v. Cilione,* 293 Pa. 208, 213, 142 A. 216; *Com. v. Loomis,* 270 Pa. 254, 258-260, 113 A. 428. In *Com. v. Cilione,* supra, the defendant, a

prisoner charged with murder, was, before trial, adjudged insane by a special jury and committed to the State Hospital for the Criminal Insane at Farview, for "so long as he shall continue to be unsound in mind, and until he shall no longer need the remedial or custodial care of said hospital." The court further ordered that when he was "restored to mental sanity" the superintendent of the hospital should report that fact to the court; and the superintendent so reported. It appeared that the insanity was not permanent in its character. It was held that the Commonwealth at the subsequent trial of the prisoner was not bound to prove affirmatively that the prisoner was sane, particularly where the prisoner did not raise the issue and ask that it be submitted to the jury. The opinion of Chief Justice MOSCHZISKER is exhaustive, and illuminating on the present issue.

Under the Criminal Procedure Act of 1860, P. L. 427, it was only in cases of doubt as to the sanity of a prisoner at the time of arraignment, that a preliminary inquiry by a special jury was to be ordered; and if the trial judge had no doubt of the prisoner's sanity, he was not bound to order a preliminary inquest, nor to submit the question of his sanity to the jury, if it was not raised, and the trial judge was not aware from his conduct that it was in issue: *Webber v. Com.*, 119 Pa. 223, 13 A. 427.

The same rule applies since the passage of the Mental Health Act of 1923, supra. It is only where a real doubt exists in the mind of the trial judge as to the sanity of the prisoner that it becomes his duty to follow the provisions of that act by ordering an inquiry by two qualified physicians or by a commission: *Com. v. Scovern*, 292 Pa. 26, 140 A. 611. See also on the general subject of insanity as a defense to crime, *Com. v. Sushinskie*, 242 Pa. 406, 89 A. 564; *Com. v. Hollowell*, 223 Pa. 494, 72 A. 845; *Taylor v. Com.* 109 Pa. 262, 270.

Proof that insanity has existed in the past does not

raise a presumption in law, sufficient to excuse a grave felony, that it continued up to the time of committing the subsequent crime: *Com. v. Calhoun,* 238 Pa. 474, 86 A. 472.

It is only in cases where the insanity is permanent and incurable and without lucid intervals that there is any presumption that one who has been declared insane, continues to be legally insane, so as to excuse his crimes, until and unless he is pronounced sane and discharged by court authority. In other cases there is no presumption that the insanity continues so as to excuse his acts, and if it is alleged to continue, definite, satisfactory evidence must be produced on the defendant's behalf to establish the fact.

In the present case the relator's insanity was not permanent, for he is now sane, and has been for years—in fact, at least ever since his commitment to the penitentiary. And he produced no evidence to the court of any mental disorder or insanity existing when he committed the burglaries to which he pleaded guilty.

Whether a man was sane or insane at the time of the commission of a crime, or at the time of his arraignment or trial, is not to be fixed and determined by a prior adjudication made months before, followed by treatment in a hospital for mental diseases, and resulting in a recommendation for his discharge prior to the commission of the criminal act.

The fact that petitioner waited 18 years to raise the question, during which time he was released on parole after serving nearly 16 years, and shortly after such release committed another crime requiring his return to the penitentiary, is a matter entitled to some consideration as bearing on his sanity when he committed the crimes for which he is now imprisoned.

The rule, granted on the petition of relator, to show cause why a writ of habeas corpus should not issue, is discharged.

476

PER CURIAM, January 25, 1945:

The foregoing opinion had been prepared by President Judge KELLER before his death on January 16, 1945. It is now adopted and filed as the opinion of the Court.